> **This Opinion Is a**
> **Precedent of the TTAB**

Mailed: September 22, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

——

Trademark Trial and Appeal Board

——

*In re Olin Corporation*

——

Serial No. 86651083

——

Bryan K. Wheelock of Harness Dickey & Pierce, PLC,
    for Olin Corporation.

Tasneem Hussain, Trademark Examining Attorney, Law Office 118,
    Michael Baird, Managing Attorney.

——

Before Lykos, Hightower, and Heasley,
    Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

This ex parte appeal requires us to explore the interplay between Sections 2(e)(4) and 2(f) of the Trademark Act, 15 U.S.C. §§ 1052(e)(4) and 1052(f), particularly in intent-to-use applications.

Applicant Olin Corporation has applied to register the mark OLIN (in standard characters) on the Principal Register for the following goods:[1]

> Chlorine; hydrochloric acid; potassium hydroxide; sodium hydroxide; sodium hypochlorite; hydrogen; sodium

---

[1] Application Serial No. 86651083, filed June 4, 2014.

chloride; sulfuric acid; ethylene dichloride; vinyl chloride monomer; acetone; cumene; phenol; allyl chloride; epichlorohydrin; bisphenol A; unprocessed synthetic novolac resins; unprocessed epoxy resins, including unprocessed liquid epoxy resins and unprocessed advanced epoxy resins; unprocessed epoxy novolac resins; amine-based hardeners, namely, chemical additives for resins; polyphenolic-based hardeners, namely, chemical additives for resins; chlorinated hydrocarbons; chemical products, namely chemicals for industrial purposes; unprocessed synthetic resins; chlorinated organic chemicals for use in industry; chlorinated inorganic chemicals for use in industry, and chemical preparations, namely, chlorinated solvents for industrial and commercial use, in International Class 1; and

Semi-processed synthetic novolac resins; semi-processed epoxy resins including semi-processed liquid epoxy resins and semi-processed advanced epoxy resins; semi-processed epoxy novolac resins; semi-processed synthetic resins, in International Class 17.

Applicant seeks registration for all goods based on its allegation of a *bona fide* intention to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

The Trademark Examining Attorney has refused registration on the ground that Applicant's mark is primarily merely a surname under Trademark Act Section 2(e)(4), and Applicant has not provided sufficient evidence of acquired distinctiveness to support registration under Section 2(f) of the Act.

When the refusal was made final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the request for reconsideration, the appeal resumed.

We affirm the refusal to register.

## I.    Issues on Appeal

During examination and on appeal, Applicant has appeared to argue that its mark should not be refused registration as primarily merely a surname because it has acquired distinctiveness as a trademark. *See, e.g.*, February 25, 2016 Response to Office Action (asserting that "the primary significance of OLIN in this country is to identify applicant and its products"); Appeal Brief at 17, 7 TTABVUE 18 ("Since its first response, applicant has pointed out that by virtue of this proven longstanding and extensive use of OLIN . . . the term OLIN is not primarily merely a surname, the term OLIN has acquired a meaning beyond any surname significance[.]").

It has long been established, however, that whether a mark is primarily merely a surname and whether it has acquired secondary meaning are separate considerations under the Trademark Act. Section 2 of the Act provides, in pertinent part:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
>
> (e) Consists of a mark which, . . . (4) is primarily merely a surname. . . .
>
> (f) Except as expressly provided in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing herein shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.

The text of the statute makes clear that a mark which by its inherent nature is primarily merely a surname nonetheless may be registered if it has become distinctive of an applicant's goods in commerce. As Professor McCarthy succinctly explains:

> The statutory word "primarily" refers to the main significance of a word as a word, not to its significance as a trademark due to advertising and promotion. MCDONALD'S for quick service restaurants was found to be "primarily merely a surname" even though it has achieved trademark significance. Secondary meaning under § 2(f) must always be submitted on the record to register such a surname as a mark.

2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 13:28 (4th ed. 2017) ("MCCARTHY") (citing *In re McDonald's Corp.*, 230 USPQ 304 (TTAB 1986)). In other words, "[a] term's secondary meaning does not necessarily mean second in importance or significance but, merely, second in time." *McDonald's*, 230 USPQ at 307.

To overcome a surname refusal, therefore, an applicant must both specifically claim and prove that its mark has acquired distinctiveness under Section 2(f). It cannot simply assume that acquired distinctiveness obviates surname significance under Section 2(e)(4). The Board has repeatedly rejected such arguments. *See In re Cazes*, 21 USPQ2d 1796, 1797 (TTAB 1991) (affirming surname refusal and stating: "Applicant's argument is, essentially, that LIPP or BRASSERIE LIPP is no longer primarily merely a surname because the significance of the term is now that of a mark for her restaurant services. The difficulty with this argument is that the applicant has not claimed the benefits of Section 2(f) of the Act and, without a formal

claim of distinctiveness under this section, evidence of fame cannot serve as the basis for allowing registration of applicant's mark."); *In re Industrie Pirelli Societa per Azioni*, 9 USPQ2d 1564, 1565 (TTAB 1988) (affirming surname refusal of PIRELLI and stating: "The fame of applicant's mark and the existence of prior registrations would certainly be relevant factors in establishing distinctiveness under Section 2(f) of the Trademark Act. Applicant has not claimed the benefits of Section 2(f) and, without a formal claim of distinctiveness under Section 2(f), the evidence of fame and prior registration cannot serve as the basis for allowing registration of applicant's mark."), *aff'd unpub'd*, 883 F.2d 1026 (Fed. Cir. 1989).

In this case, as in *Cazes* and *Pirelli*, Applicant never explicitly requested registration under Section 2(f). Nonetheless, the Examining Attorney "afforded applicant the benefit of doubt" by construing its arguments in response to the Section 2(e)(4) refusal as an apparent claim of acquired distinctiveness in the alternative. Examining Attorney's Brief, 9 TTABVUE 3.[2] The Examining Attorney then advised Applicant of the requirements for claims of acquired distinctiveness for intent-to-use applications and found Applicant's showing of acquired distinctiveness pursuant to Section 2(f) to be unsupported.[3]

For these reasons, we consider in turn whether the record shows that Applicant's mark OLIN is primarily merely a surname pursuant to Section 2(e)(4), and if so,

---

[2] The better practice is for the applicant to specifically state that it is claiming acquired distinctiveness (or acquired distinctiveness in the alternative), so that the basis on which the applicant seeks registration is clear. *See generally* TMEP §§ 714.05(a)(i), 1212.02 (Apr. 2017).

[3] *See* March 8, 2016 Office Action; May 5, 2016 Final Office Action.

whether Applicant has established that its mark has acquired distinctiveness under Section 2(f) so that it is registrable on the Principal Register.

## II.  Refusal under Section 2(e)(4)

A term is primarily merely a surname if, when viewed in relation to the goods or services for which registration is sought, its primary significance to the purchasing public is that of a surname. *Earnhardt v. Kerry Earnhardt, Inc.*, 846 F.3d 1374, 123 USPQ2d 1411, 1413 (Fed. Cir. 2017); *In re Beds & Bars Ltd.*, 122 USPQ2d 1546, 1548 (TTAB 2017). When we are faced with a Section 2(e)(4) refusal of a term in standard character form, with no other literal or design elements, we consider the impact the applied-for term has or would have on the purchasing public because "it is that impact or impression which should be evaluated in determining whether or not the primary significance of a word when applied to a product is a surname significance. If it is, *and it is only that*, then it is primarily merely a surname." *In re Harris-Intertype Corp.*, 518 F.2d 629, 186 USPQ 238, 239 (CCPA 1975) (quoting *Ex parte Rivera Watch Corp.*, 106 USPQ 145, 149 (Comm'r Pat. 1955)).

Whether the primary significance of an applied-for mark is merely that of a surname is a question of fact. *See In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653-54 (Fed. Cir. 1985). There is no rule as to the kind or amount of evidence necessary to make out a prima facie showing that the applied-for mark would be perceived as primarily merely a surname. This question must be resolved on the specific facts presented in each case. *Id.* at 654; *see also, e.g., Beds & Bars*, 122

USPQ2d at 1548. The entire record is examined to determine the primary significance of a term.

In *Darty*, the Federal Circuit considered several factors in determining whether the purchasing public would perceive a proposed mark as primarily merely a surname, including whether the applicant adopted a principal's name and used it in a way that revealed its surname significance; whether the term had a nonsurname "ordinary language" meaning; and the extent to which the term was used by others as a surname. *Id.*, 225 USPQ at 653. The factors laid out in *In re Benthin Mgmt. GmbH*, 37 USPQ2d 1332, 1333-34 (TTAB 1995), also are examples of inquiries that may lead to evidence regarding the purchasing public's perception of a term's primary significance.[4] These considerations are not exclusive, and any of these circumstances – singly or in combination – and any other relevant facts may shape the analysis in a particular case.[5] *E.g.*, *In re Eximius Coffee, LLC*, 120 USPQ2d 1276, 1278 (TTAB 2016); *In re Integrated Embedded*, 120 USPQ2d 1504, 1506 n.4 (TTAB 2016). We address in turn the matters relevant to our analysis of this case.

---

[4] In *Benthin*, the Board stated that "factors" to be considered in determining whether a term is primarily merely a surname include (1) the degree of a surname's rareness; (2) whether anyone connected with applicant has that surname; (3) whether the term has any recognized meaning other than that of a surname; (4) whether the term has the "structure and pronunciation" of a surname; and (5) whether the stylization of lettering is distinctive enough to create a separate commercial impression. Where, as here, the mark is in standard characters, it is unnecessary to consider the fifth factor. *Integrated Embedded*, 120 USPQ2d at 1506 n.4; *In re Yeley*, 85 USPQ2d 1150, 1151 (TTAB 2007).

[5] *See Benthin*, 37 USPQ2d at 1333 (stating that notwithstanding the rareness of BENTHIN as a surname, panel "would find" that it "would be perceived as primarily merely a surname" because of lack of other meanings and because it is the name of applicant's Managing Director, but the highly stylized form shifted the balancing of factors to a finding that BENTHIN is not primarily merely a surname).

A. Whether OLIN Is Rarely Encountered as a Surname

We first consider the frequency of, and public exposure to, the term OLIN's surname use. *See Darty*, 225 USPQ at 653 ("In addition, the examiner made of record evidence that others in a number of cities in this country bear the surname DARTY. Thus, as a surname, DARTY is not so unusual that such significance would not be recognized by a substantial number of persons."). That being said, even a rare surname may be held primarily merely a surname if its primary significance to purchasers is that of a surname. "The relevant question is not simply how frequently a surname appears, however, but whether the purchasing public for Applicant's [goods] is more likely to perceive Applicant's proposed mark as a surname rather than as anything else." *Beds & Bars*, 122 USPQ2d at 1551.

Evidence introduced by the Examining Attorney includes the following:

- A LexisNexis public records search for the surname "Olin" that returned 7,552 results.[6] The first 500 results were made of record and span numerous states.

- Separate Wikipedia entries for Minnesota politician David M. "Dave" Olin (born 1947); Virginia congressman James Randolph "Jim" Olin (1920-2006); actor, director, and producer Kenneth Edward "Ken" Olin (born 1954); Swedish actress living in New York Lena Maria Jonna Olin (born 1955); and Vermont congressman Gideon Olin (1743-1823).[7]

- Articles from major U.S. newspapers referring to people with the surname "Olin," including John Olin, chief financial officer of Harley-Davidson Inc.;[8]

---

[6] May 5, 2016 Final Office Action at 39-61.

[7] *Id.* at 15-20, 33-38 (from Wikipedia.org).

[8] *Id.* at 2-7 (James R. Hagerty, *Harley Dealers Offer Discounts, Quietly*, WALL ST. J. (Jan. 28, 2016), http://wsj.com/articles/harley-davidson-cuts-shipments-projection-for-2016-14539857 64).

Laura Olin, who ran social media strategy for the Obama campaign in 2012;[9] and Stig Olin, a Swedish actor, director and composer (1920-2008).[10]

- Results of a search of 411.com finding 100 exact matches for "Olin."[11]

We also take judicial notice of data from the 2010 U.S. Census, which counted 4,163 people with the surname "Olin."[12]

Based on this evidence, we find that OLIN is not rarely encountered as a surname, and therefore it is likely to be perceived by the public as having surname significance.

### B. Whether OLIN is the Surname of Anyone Connected with Applicant

We next consider whether anyone who has a publicly known connection with Applicant has the surname "Olin."



Origin of Olin Industries

Franklin W. Olin

The Examining Attorney made of record screenshots from the "About Us" section of Applicant's website, olin.com/History. It states that one of Applicant's predecessor companies was founded in 1892 by Franklin W. Olin, a Vermont-born engineer who was educated at Cornell University.[13] A small picture of Mr. Olin appears on the web page (above).

---

[9] *Id.* at 8-15 (Jonah Bromwich, *Justin Trudeau, Politician and Star of His Own Viral Universe*, N.Y. TIMES (Apr. 26, 2016), http://www.nytimes.com/2016/04/27/world/americas/ justin-trudeau-quantum-computing-canada.html?_r=0).

[10] *Id.* at 21 (Adam Bernstein, *Stig Olin, 87; Swedish Star Found Fame As an Actor*, WASH. POST (July 12, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/07/11/ AR2008071102978.html).

[11] September 16, 2015 Office Action at 2-5.

[12] "File B: Surnames Occurring 100 or more times," at the web page "Frequently Occurring Surnames from the 2010 Census" (https://www.census.gov/topics/population/genealogy/data/ 2010_surnames.html) (last accessed Aug. 23, 2017). The Board may take judicial notice of census data. *In re Aquamar, Inc.*, 115 USPQ2d 1122, 1127 n.6 (TTAB 2015).

[13] September 16, 2015 Office Action at 10.

Several paragraphs later, discussing events of the 1940s and 1950s, the website states: "With the retirement of founder Franklin Olin from active management, his sons John and Spencer went on to guide the company through a remarkable period of expansion."[14] There is no record evidence as to when John and Spencer Olin ceased being involved with Applicant, nor is there evidence that anyone with the surname "Olin" has had a publicly known connection with Applicant since their time guiding the company.

Although acknowledging that the company was founded by Franklin Olin, Applicant represents that: "No one in current upper management of applicant uses the surname OLIN." Appeal Brief at 9 & n.22, 7 TTABVUE 10. Applicant submitted no evidence on this point.[15]

There is no evidence that anyone with the surname "Olin" has had a publicly known connection with the company in recent years, but Applicant still markets the fact that its founder had that name. This further supports that the public perceives OLIN primarily as a surname. *See In re Adlon Brand GmbH & Co. KG*, 120 USPQ2d 1717, 1722 (TTAB 2016) (finding evidence clearly indicated "that the hotel was named ADLON because that was the surname of its founder, and was subsequently held out

---

[14] *Id.* at 11.

[15] Applicant did cite to an Internet link, here and at several other places in its brief. This is improper. Because the information displayed at a link's Internet address can be changed or deleted, merely providing a link to a website is insufficient to make information from that site of record. *See, e.g.*, *In re Powermat Inc.*, 105 USPQ2d 1789, 1791 (TTAB 2013); *In re HSB Solomon Assocs. LLC*, 102 USPQ2d 1269, 1274 (TTAB 2012). Even had this been an effective way to make evidence of record, furthermore, evidence submitted with an appeal brief is untimely. Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d) ("The record in the application should be complete prior to the filing of an appeal.").

as a family operation. It is interlaced with references to persons bearing the surname ADLON who were involved in founding, managing, or promoting the hotel.").

### C. Whether OLIN Has Any Recognized Meaning Other Than As a Surname

The Examining Attorney introduced evidence that searches for "olin" in the Collins American English Dictionary and the Macmillan Dictionary returned no results.[16] This constitutes "negative" dictionary evidence – that is, evidence showing that the dictionaries searched do not have an entry for the term "olin." In the absence of any countervailing evidence supplied by Applicant, this establishes that OLIN has no recognized meaning other than as a surname. *Adlon*, 120 USPQ2d at 1719-20 (stating that the examining attorney's "'negative dictionary' evidence, that is, evidence showing that the term ADLON cannot be found in [ ] dictionaries" supported a finding "that there is no other apparent meaning of the term" as a word).

### D. Whether OLIN Has the Structure and Pronunciation of a Surname

Finally, we determine whether OLIN has the structure and pronunciation of a surname. In support of their respective positions, applicants and examining attorneys may submit evidence that, due to a term's structure or pronunciation, the public would or would not perceive it to have surname significance.

The Examining Attorney submitted the results of a search of the "Surname Helper" website for surnames starting with "oli," which listed "Olin" among more

---

[16] September 16, 2015 Office Action at 6-9 (from http://www.collinsdictionary.com/spellcheck/american?q=olin and http://www.macmillandictionary.com/us/spellcheck/american/?q=olin).

than 60 other results.[17] Applicant, in turn, argues that, at four letters, OLIN is unusually short for a surname. Appeal Brief at 10, 7 TTABVUE 11. Applicant's argument is not persuasive. Turning once again to data from the most recent U.S. Census, we observe that 16 of the 100 most frequently occurring surnames, shared by millions of Americans in all, have four or fewer letters.[18]

Although we find that OLIN has the structure and pronunciation of a surname, this evidence has little significance in our analysis in light of the other evidence in this case. Even if OLIN did not have the "structure and pronunciation of a surname," our conclusion as to the surname refusal would not change.

### E. Conclusion as to Surname Refusal

There is no evidence that any other consideration is relevant to our assessment of the nature of Applicant's mark. We find that the record, taken as a whole, establishes that the primary significance of OLIN to the purchasing public is merely that of a surname within the meaning of Section 2(e)(4).

## III. Acquired Distinctiveness under Section 2(f)

We next analyze whether Applicant has met its burden to prove that OLIN has acquired distinctiveness. *See In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116

---

[17] September 16, 2015 Office Action at 16-18 (from http://surhelp-bin.rootsweb.ancestry.com/ sursrch.pl). The website states that "Surname Helper is a surname engine for queries and surname registrations posted on various genealogy sites." Some of the other surnames listed include Olinde, Olim, Olive, Oliver, and Oliva.

[18] I.e., Lee (ranked 21), King (34), Hill (39), Hall (45), Diaz (55), Cruz (57), Cook (65), Reed (73), Kim (77), Cox (78), Ward (79), Wood (84), Gray (87), Ruiz (89), Long (97), and Ross (98). "File A: Top 1000 Names," at the "Frequently Occurring Surnames from the 2010 Census" web page (https://www.census.gov/topics/population/genealogy/data/2010_surnames.html).

USPQ2d 1262, 1264 (Fed. Cir. 2015); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1006-07 (Fed. Cir. 1988). This determination examines all of the circumstances involving the use of the mark. *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005).

Before assessing Applicant's evidence of acquired distinctiveness, we note that this is an application filed under Section 1(b) of the Trademark Act, the "intent-to-use" provision. A claim of distinctiveness under Section 2(f) normally is not raised in a Section 1(b) application before the applicant files an amendment to allege use or a statement of use because a claim of acquired distinctiveness, by definition, requires prior use. *In re Binion*, 93 USPQ2d 1531, 1538 (TTAB 2009). Indeed, when intent-to-use applications were authorized by the Trademark Law Revision Act of 1988, the Office initially prohibited an applicant from claiming acquired distinctiveness before filing an amendment to allege use or a statement of use. *Rogers*, 53 USPQ2d at 1744 n.3. Shortly thereafter, the Office expressly revised its policy on this issue:

> to permit the filing of such a claim before filing an amendment to allege use or statement of use, provided the applicant can establish that, as a result of the applicant's use of the mark on other goods or services, the mark has become distinctive of those other goods or services and that this previously created distinctiveness will transfer to the goods and services listed in the application when the mark is used on them.
>
> In such a case, the applicant must establish acquired distinctiveness as to the other goods or services by appropriate evidence, such as, (i) ownership of a prior registration for the same mark for related goods or services, (ii) a prima facie claim of acquired distinctiveness based on five years use of the same mark with related goods or services or (iii) actual evidence of acquired distinctiveness for the same mark with respect to the other goods or services.

> The goods and services identified in the application must be sufficiently related to the goods and services specified in the claim to support a determination that the previously created distinctiveness will transfer to the goods and services in the application upon use. See Bausch & Lomb Inc. v. Leupold & Stevens Inc., 6 USPQ2d 1475 (TTAB 1988). . . .

Trademark Examination Guide 3-90 (Aug. 28, 1990). This policy has been reflected in Trademark Manual of Examining Procedure (TMEP) § 1212.09(a) since 1993 and applied by the Board in *Binion*, 93 USPQ2d at 1539 (assessing evidence of distinctiveness purportedly acquired through prior use as well as registration for 1(b) applications) and in a few unpublished decisions, including some based only on prior common-law use of a mark and not its registration.[19]

---

[19] *See, e.g.*, *In re Bottega Veneta Int'l S.a.r.l.*, Serial No. 77219184, slip op. at 32 n.23, 2013 WL 5655822, at *12 n.23 (TTAB Sept. 30, 2013) (not precedential) ("Further, the acquired distinctiveness of the mark in connection with handbags is so strong, and the other Class 18 items are so closely related to handbags, that the acquired distinctiveness of the mark would transfer to these goods in any case. See TMEP § 1212.09(a) and cases cited therein."); *In re Mittal Steel Techs. Ltd.*, Serial No. 78979091, slip op. at 8-13, 2008 WL 5078736, at *4-5 (TTAB Nov. 18, 2008) (not precedential) (reversing refusal and finding that applicant established acquired distinctiveness in surname mark based on evidence of common-law use for related goods and services); *In re VoiceMatch Corp.*, Serial No. 76433641, slip op. at 7-10, 2006 WL 2303371, at *4 (TTAB July 26, 2006) (not precedential) (considering a common-law showing for related goods but finding it inadequate).

Professor McCarthy has criticized this basis for establishing secondary meaning as beyond the statutory authority of Section 2(f). In an author's comment, he frames the relevant question as: "is there statutory *authority* in the Lanham Act which authorizes and permits the PTO to find secondary meaning in a noninherently distinctive designation that has never been used and therefore could not have acquired distinctiveness (secondary meaning)?" 2 McCarthy § 15.65. In the view of the majority, the policy does not apply to "a designation that has never been used" because it is limited to marks that already have acquired distinctiveness through use with goods or services sufficiently similar or related to those identified in the application. *See Dial-A-Mattress*, 57 USPQ2d at 1812-13. Because trademark rights at common law flow from use, we cannot identify a compelling reason to limit the opportunity to prove that a mark in an intent-to-use application has acquired distinctiveness to those previously registered, thereby excluding use of unregistered marks that have become distinctive through use for sufficiently similar or related goods or services.

As mentioned in TMEP § 1212.09(a), an applicant can establish a prima facie case of acquired distinctiveness in the mark in an intent-to-use application where it can show that same mark acquired distinctiveness for sufficiently similar or related goods, and that this acquired distinctiveness will transfer to the goods specified in the application when the mark is used in connection with them. *See, e.g.*, *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001); *In re Highlights for Children, Inc.*, 118 USPQ2d 1268, 1273-74 (TTAB 2016); *In re Nielsen Bus. Media Inc.*, 93 USPQ2d 1545, 1547 (TTAB 2010). To establish that such a transfer will take place, Applicant must show a sufficient similarity or relationship between the goods in connection with which the mark has acquired distinctiveness and those identified in the intent-to-use application so that the purchasing public will perceive that the mark's primary significance is to identify Applicant as the source of the new goods. *See Binion*, 93 USPQ2d at 1538; *In re Rogers*, 53 USPQ2d 1741, 1744-45 (TTAB 1999).

As explained in the TMEP, and just as with a use-based application, there are three methods for satisfying the first element of the test, that is, establishing that a mark has acquired distinctiveness for goods sufficiently similar or related to those identified in the intent-to-use application. Trademark Rule 2.41(a), 37 C.F.R. § 2.41(a), provides distinctiveness may be proven under Section 2(f) by the following means:

(1) Ownership of prior registration(s). In appropriate cases, ownership of one or more active prior registrations on the Principal Register or under the Trademark Act of 1905 of the same mark may be accepted as prima facie evidence of distinctiveness if the goods or services are sufficiently similar to the goods or services in the application; however, further evidence may be required.

(2) Five years substantially exclusive and continuous use in commerce. In appropriate cases, if a trademark or service mark is said to have become distinctive of the applicant's goods or services by reason of the applicant's substantially exclusive and continuous use of the mark in commerce for the five years before the date on which the claim of distinctiveness is made, a showing by way of verified statements in the application may be accepted as prima facie evidence of distinctiveness; however, further evidence may be required.

(3) Other evidence. In appropriate cases, where the applicant claims that a mark has become distinctive in commerce of the applicant's goods or services, the applicant may, in support of registrability, submit with the application, or in response to a request for evidence or to a refusal to register, verified statements, depositions, or other appropriate evidence showing duration, extent, and nature of the use in commerce and advertising expenditures in connection therewith (identifying types of media and attaching typical advertisements), and verified statements, letters or statements from the trade or public, or both, or other appropriate evidence of distinctiveness.

Trademark Rule 2.41 was revised by the Office in July 2015 to clarify that the goods or services identified in a prior registration must be "sufficiently similar" to those in an application to be accepted as prima facie evidence of distinctiveness. *See* Changes in Requirements for Collective Trademarks and Service Marks, Collective Membership Marks, and Certification Marks, 80 Fed. Reg. 33170, 33172 (June 11, 2015). The rule does not directly state that it applies to transfer of acquired distinctiveness to applications under Section 1(b), but we find that it does. Like the

Office policy, precedent from our primary reviewing court specific to intent-to-use applications has required "related goods or services." *See, e.g.*, *Dial-A-Mattress*, 57 USPQ2d at 1812 ("Thus, an applicant can establish acquired distinctiveness in an intent-to-use application where it can show that 'same mark' acquired distinctiveness for *related goods or services*, and that this acquired distinctiveness will transfer to the goods or services specified in the application when the mark is used in connection with them.") (emphasis added).

Whether goods or services are similar or related may involve different inquiries. For example, some complementary goods – like pancake mix and syrup – are dissimilar but highly related. *See, e.g.*, *Packard Press Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 56 USPQ2d 1351, 1354 (Fed. Cir. 2000) (stating that goods unrelated in kind nonetheless "could still be related in the mind of the consuming public as to the origin of the goods"). To incorporate both inquiries under our precedent and amended Rule 2.41(a)(1), and for the sake of consistency, the Board adopts a requirement that goods or services for which the same mark has acquired distinctiveness must be "sufficiently similar or related" to the goods or services identified in an intent-to-use application, for all three types of proof of acquired distinctiveness. *See* TMEP § 1212.04(c) (Apr. 2017) (discussing the determination required under Rule 2.41(a)(1)); *Kellogg Co. v. Gen. Mills Inc.*, 82 USPQ2d 1766, 1771 (TTAB 2007) (finding, for breakfast cereal and food bars derived from cereal, "that the close relationship between the goods is self-evident from the respective identifications of goods"); *cf.* TMEP § 1212.09(a) (Apr. 2017):

> To satisfy the first element, the applicant must establish acquired distinctiveness as to the other goods or services by appropriate evidence, such as ownership of an active prior registration for the same mark for *sufficiently similar or related* goods or services (*see* TMEP §§1212.04–1212.04(e)), a prima facie showing of acquired distinctiveness based on five years' use of the same mark with *related* goods or services (*see* TMEP §§1212.05–1212.05(d)), or actual evidence of acquired distinctiveness for the same mark with respect to the other goods or services (*see* TMEP §§1212.06–1212.06(e)(iv)). (emphasis added).

We emphasize that, by the very nature of the inquiry, Section 1(b) applicants face a heavy burden in establishing that their mark will acquire distinctiveness when use commences. Accordingly, the required showing for acquired distinctiveness to "transfer" to new products is a rigorous one. *Cf. In re La. Fish Fry Prods.*, 116 USPQ2d at 1265 (stating that length of use is evidence of acquired distinctiveness).

Applying the first prong of the test to the facts of this appeal, the Examining Attorney made of record several existing and expired registrations[20] owned by Applicant for the mark OLIN, in standard character and stylized form, all of which registered either on the Supplemental Register or pursuant to Section 2(f). The two active registrations issued under Section 2(f) are for the typed drawing OLIN for "cartridges, and high explosives" and for "non-ferrous metals and alloys."[21]

---

[20] The expired registrations are irrelevant. Rule 2.41(a)(1) is limited to "active prior registrations on the Principal Register." We add that not all active Principal Register registrations could, by themselves, support registration of the new mark. For example, registrations issued under Sections 44(e) or 66(a), for which proof of use has not yet been supplied to the Office, would be insufficient in these circumstances.

[21] Registration Nos. 0659503 and 0848870, attached to the May 5, 2016 Final Office Action at 63-64, 67-68, 82-83, and 86-87; Registration No. 0848870 also was submitted with the September 16, 2015 Office Action at 19-20. Before November 2, 2003, "standard character"

Applicant also owns two active registrations on the Principal Register that issued without a showing of acquired distinctiveness: **Olin** for "ammunition and shotguns" and OLIN in standard characters for "ammunition."[22]

As noted *supra*, Applicant seeks registration for the following goods in International Classes 1 and 17:

> Chlorine; hydrochloric acid; potassium hydroxide; sodium hydroxide; sodium hypochlorite; hydrogen; sodium chloride; sulfuric acid; ethylene dichloride; vinyl chloride monomer; acetone; cumene; phenol; allyl chloride; epichlorohydrin; bisphenol A; unprocessed synthetic novolac resins; unprocessed epoxy resins, including unprocessed liquid epoxy resins and unprocessed advanced epoxy resins; unprocessed epoxy novolac resins; amine-based hardeners, namely, chemical additives for resins; polyphenolic-based hardeners, namely, chemical additives for resins; chlorinated hydrocarbons; chemical products, namely chemicals for industrial purposes; unprocessed synthetic resins; chlorinated organic chemicals for use in industry; chlorinated inorganic chemicals for use in industry, and chemical preparations, namely, chlorinated solvents for industrial and commercial use; and
>
> Semi-processed synthetic novolac resins; semi-processed epoxy resins including semi-processed liquid epoxy resins and semi-processed advanced epoxy resins; semi-processed epoxy novolac resins; semi-processed synthetic resins.

---

drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. TMEP § 807.03(i) (Apr. 2017).

[22] Registration Nos. 1468218 and 3414111. These two registrations were not made of record during examination. The Board does not take judicial notice of registrations in Office records. *In re Jonathan Drew Inc.*, 97 USPQ2d 1640, 1644 n.11 (TTAB 2011). Nonetheless, because Applicant discussed Registration No. 3414111 in its appeal brief and the Examining Attorney addressed both of these registrations in her brief and neither objected to the discussion of the other, we will treat both registrations as though they are of record. Appeal Brief at 10, 7 TTABVUE 11; Examining Attorney's Brief, 9 TTABVUE 10. Consideration of these registrations does not change the outcome.

To decide whether Applicant has established acquired distinctiveness in these goods based on its prior registrations, we first must determine whether the goods identified in the application are sufficiently similar or related to "cartridges, and high explosives," "non-ferrous metals and alloys," "ammunition and shotguns" and "ammunition." It is self-evident from the identifications that Applicant's prior registrations are for goods unrelated to those identified in the application. Applicant does not argue otherwise. *See* Reply Brief, 10 TTABVUE 2 ("Even if the goods and services are different . . . ."). The registrations do not satisfy the first element of the secondary meaning test in Rule 2.41(a)(1).

We next consider whether Applicant has made a prima facie showing of acquired distinctiveness based on five years' use of the same mark with sufficiently similar or related goods under Rule 2.41(a)(2). Surnames generally may be registered pursuant to Section 2(f) on a showing of five years of substantially exclusive and continuous use of the name as a mark in commerce that may lawfully be regulated by the U.S. Congress, along with the applicant's statement of belief that the mark has become distinctive of its goods. *Adlon*, 120 USPQ2d at 1722 n.33; *see also In re Lorillard Licensing Co.*, 99 USPQ2d 1312, 1316 (TTAB 2011).

The only evidence Applicant submitted in support of registration was two declarations from executive John L. McIntosh. They state, in most relevant part:

First McIntosh Declaration[23]

¶ 1.  Olin is the name of a well-known publically traded company (NYSE Symbol: OLN), has been listed on the New York Stock Exchange since 1917, and is a Fortune 1000 Company (938).

¶ 3.  Last year Olin had more than $2.2 billion in revenue from ammunition and chemicals.

¶ 5.  Olin (or its predecessor companies) has been producing chlorine and caustic soda for over 100 years.

¶ 7.  Olin is the No. 1 merchant supplier of chlorine in North America; the second largest supplier of potassium hydroxide in North America, and the largest supplier of caustic soda in North America.

Second McIntosh Declaration[24]

¶ 6.  Olin began marketing, promoting, advertising, selling and offering for sale chemical products under the OLIN mark in U.S. commerce at least as early as 1970.

¶ 7.  In 2015, Olin had more than $2.8 billion in sales of chemicals and ammunition.

¶ 8.  The majority of Olin's sales are from the Chlor Alkali Products and Vinyls and the Olin Epoxy segments. For example, 54% of Olin's fourth quarter 2015 sales were represented by Olin's Chlor Alkali Products and Vinyls segment, which manufactures and sells chlorine and caustic soda, ethylene dichloride and vinyl chloride monomer, methyl chloride, methylene chloride, chloroform, carbon tetrachloride, perchloroethylene, trichloroethylene and vinylidene chloride, hydrochloric acid, hydrogen, bleach products and potassium hydroxide. 34% of Olin's

---

[23] The First McIntosh Declaration, which states that Mr. McIntosh is Applicant's Executive Vice President & President, Chemicals and Ammunition, was signed November 20, 2015 and attached to Applicant's February 25, 2016 Response to Office Action at 2-4.

[24] The Second McIntosh Declaration, in which Mr. McIntosh's title is Executive Vice President, Chemicals & Ammunition, was signed November 2, 2016 and attached to Applicant's November 5, 2016 Request for Reconsideration at 2-6, 5 TTABVUE 8-12.

fourth quarter 2015 sales were represented by Olin's Epoxy segment, which produces and sells a full range of epoxy materials, including allyl chloride, epichlorohydrin, liquid epoxy resins and downstream products such as converted epoxy resins and additives.

¶ 10.  Olin is now the leading chlor alkali supplier globally, and is the No. 1 global chlor alkali producer, No. 1 global seller of membrane grade caustic soda, No. 1 global supplier of epoxy materials, No. 1 global seller of chlorinated organics, No. 1 North American seller of chlorine, No. 1 North American seller of industrial bleach, and No. 1 North American seller of on-purpose hydrochloric acid.

¶ 11.  Olin has been selling chemicals, including chlorine, caustic soda, hydrochloric acid, potassium hydroxide, sodium hydroxide, sodium hypochlorite, hydrogen, and sodium chloride (the "Historic Products") in connection with the OLIN mark in substantial quantities for at least the five years preceding this application, and as a result of this long and continuous use, the term OLIN has become a distinctive trademark of the Olin Corporation for the Historic Products.

¶ 15.  As a result of a recent merger that made national news, the OLIN house trademark has been or soon will be used on the remaining closely related goods listed in the application, namely, sulfuric acid, ethylene dichloride, vinyl chloride monomer, acetone, cumene, phenol, allyl chloride, epichlorohydrin, bisphenol A, unprocessed synthetic novolac resins, unprocessed epoxy resins, including unprocessed liquid epoxy resins and unprocessed advanced epoxy resins, unprocessed epoxy novolac resins, amine-based hardeners, namely, chemical additives for resins, polyphenolic-based hardeners, namely, chemical additives for resins, chlorinated hydrocarbons; chemical products, namely chemicals for industrial purposes, unprocessed synthetic resins, chlorinated organic chemicals for use in industry, chlorinated inorganic chemicals for use in industry, and chemical preparations, namely, chlorinated solvents for industrial and commercial

use, and semi-processed synthetic novolac resins, semi-processed epoxy resins including semi-processed liquid epoxy resins and semi-processed advanced epoxy resins, semi-processed epoxy novolac resins, semi-processed synthetic resins (the "Expanded Products"), most of which are derivative products of the Historic Products that Olin has been selling under the OLIN trademark in the United States in substantial quantities for many years.

¶ 16. The Expanded Products are closely related in the minds of customers with the Historic Products, because (1) the Expanded Products are made from some of the Historic Products; (2) companies, like Olin, that sell the Expanded Products often sell some or all of the Historic Products; and/or (3) customers that buy the Expanded Products often buy some of the Historic Products. Olin and many of its competitors promote market, advertise, sell and offer to sell both the Expanded Products and closely related Historic Products and consumers expect that they come from the same source.

¶ 17. Because of this close relation between the Expanded Products and the Historic Products, Olin's long history of using OLIN as a trademark for the Historic Products, the general fame of Olin and the OLIN trademark in the chemical industry, in my opinion consumers immediately identify the OLIN trademark as a source identifier for the Expanded Products and Historic Products and the primary significance of the term OLIN to anyone connected with the field of chemicals is as a trademark for products from Olin Corporation.

In ¶ 11 of the Second McIntosh Declaration, Applicant attempted to make a showing of acquired distinctiveness based on at least five years' use of the mark OLIN preceding the application date in connection with what it calls the "Historic Products," that is, chlorine, hydrochloric acid, potassium hydroxide, sodium

hydroxide, sodium hypochlorite, hydrogen, and sodium chloride.[25] Each of the Historic Products also is identified in the subject application. Thus, this case presents a perhaps paradoxical aspect in that Applicant alleges acquired distinctiveness in seven types of goods on which the mark already has been used that also are listed in the intent-to-use application. In that vein, we acknowledge the Examining Attorney's arguments that Applicant did not file a request to divide the subject application, which may have opened a pathway to show acquired distinctiveness of the mark as to those particular goods. In any event, the application includes no dates of use for any goods, including the Historic Products. *See* Examining Attorney's Brief, 9 TTABVUE 10.

We need not address these issues, however, because Applicant failed to satisfy the statutory requirement of Trademark Act Section 2(f) to aver that its use of the OLIN mark on the Historic Products has been substantially exclusive. *See* Trademark Rule 2.41(a)(2); TMEP § 1212.05(d) (Apr. 2017) ("The wording 'substantially exclusive and continuous use of the mark in commerce' is essential."); *cf. In re General Mills IP Holdings II, LLC*, --- USPQ2d ----, Application Serial No. 86757390, slip op. at 11-12 (TTAB Aug. 22, 2017) (addressing analysis of substantial exclusivity for color marks); *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 USPQ2d 1392, 1396 (TTAB 2016) ("An

---

[25] Applicant also lists among its Historic Products "caustic soda," which does not appear in the application's identification of goods. We take judicial notice that caustic soda is a synonym for sodium hydroxide, which is among the identified goods. *See* MERRIAM-WEBSTER DICTIONARY (2017), https://www.merriam-webster.com/dictionary/caustic%20soda (last accessed Aug. 23, 2017). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Family Emergency Room LLC*, 121 USPQ2d 1886, 1889 n.4 (TTAB 2017).

applicant can make a prima facie showing of acquired distinctiveness of a mark if it establishes substantially exclusive *and* continuous use for five years."); *Flowers Indus. Inc. v. Interstate Brands Corp.*, 5 USPQ2d 1580, 1588-89 (TTAB 1987) (stating that "long and continuous use alone is insufficient to show secondary meaning where the use is not substantially exclusive").

Finally, we must decide whether Applicant's other evidence of acquired distinctiveness for the mark OLIN with respect to its allegedly "closely related goods" (the Historic Products) is sufficient under Rule 2.41(a)(3). We find that it is not. Applicant introduced no evidence of, for example, advertising expenditures, exclusivity of use, media coverage, survey results, or third-party affidavits asserting source-indicating recognition. *Cf., e.g.*, *Steelbuilding.com*, 75 USPQ2d at 1424 ("In determining whether secondary meaning has been acquired, the Board may examine copying, advertising expenditures, sales success, length and exclusivity of use, unsolicited media coverage, and consumer studies (linking the name to a source)."); *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985) ("An evidentiary showing of secondary meaning, adequate to show that a mark has acquired distinctiveness indicating the origin of the goods, includes evidence of the trademark owner's method of using the mark, *supplemented by* evidence of the effectiveness of such use to cause the purchasing public to identify the mark with the source of the product."); Trademark Rule 2.41(a)(3) (providing in part that an applicant may submit evidence showing "advertising expenditures in connection [with use in commerce] (identifying types of media and attaching typical

advertisements), and verified statements, letters or statements from the trade or public, or both").

The McIntosh Declarations do address sales and length of use of the OLIN mark, but they are insufficiently specific to support a conclusion that the mark has acquired distinctiveness in the minds of consumers for the Historic Products. In particular, the declarations state that Applicant or its predecessor companies have been producing chlorine for more than 100 years, and that Applicant has offered "chemical products" under the OLIN mark since at least 1970.[26] They do not, however, specify how long Applicant has been using the OLIN mark in association with chlorine or any of the other Historic Products.

The declarations state that Olin is now the largest supplier of certain types of the Historic Products in North America,[27] but not how long it has been in that position. Similarly, the declarations state that Applicant had $2.8 billion in sales in chemicals and ammunition in 2015, and that 54% of its fourth-quarter 2015 sales were from a business segment that manufactures some of the Historic Products, among other goods.[28] But Applicant does not indicate how much of those sales occurred in the United States and provides no context regarding the duration of sales of its Historic Products in which to place this single-quarter snapshot.

---

[26] *See* First McIntosh Decl. ¶ 5; Second McIntosh Decl. ¶¶ 6, 9.

[27] *See* First McIntosh Decl. ¶ 7; Second McIntosh Decl. ¶ 10.

[28] Second McIntosh Decl. ¶¶ 7-8.

For these reasons, Applicant has failed to satisfy the first required element for proving secondary meaning in an intent-to-use application by showing that the OLIN mark has acquired distinctiveness for related goods.

## IV. Conclusion

We have found that Applicant's mark is primarily merely a surname, and that Applicant failed to prove that its mark has become distinctive of goods sufficiently similar or related to those identified in the intent-to-use application. Therefore, we affirm the refusal under both Sections 2(e)(4) and 2(f) of the Trademark Act.

**Decision**: The refusal to register is affirmed.

Opinion by Lykos, Administrative Trademark Judge, concurring in part:

I concur with the majority's ultimate conclusion that Applicant has failed to prove acquired distinctiveness under Section 2(f). However, I question whether the policy originally devised in Trademark Examination Guide 3-90 (Aug. 28, 1990) and as currently set forth in TMEP Section 1212.09(a) is consistent with the statute, Trademark Rules of Practice, and case law.

> Section 2(f) of the Trademark Act provides in relevant part:
>
> Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing herein shall prevent the registration of a mark *used by the applicant* which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the

applicant in commerce for the five years before the date on which the claim of distinctiveness is made.

(Emphasis added). The underlying rationale of Section 2(f) has been explained as follows:

> [U]nlike the first five sections of 15 U.S.C. §1052 which define the grounds upon which a trademark registration is to be refused, Section 2(f) serves as an exception to a rejection under the provisions of one of the other sections, Section 2(e) (citation omitted). Section 2(f) permits registration of marks that, despite not qualifying for registration in light of Section 2(e), have nevertheless "become distinctive of the applicant's goods in commerce." Thus, "Section 2(f) is not a provision on which registration can be refused," … but is a provision under which an applicant has a chance to prove that he is entitled to a federal trademark registration which would otherwise be refused.

*Yamaha*, 6 USPQ2d at 1007 (internal citation omitted). "The statute is silent as to the weight of evidence required for a showing under Section 2(f) 'except for the suggestion that substantially exclusive use for a period of five years immediately preceding filing of an application may be considered prima facie evidence.'" *In re Owens-Corning Fiberglas Corp.*, 227 USPQ at 422 (internal citation omitted). Trademark Rule 2.41, 37 C.F.R. § 2.41, entitled "Proof of distinctiveness under section 2(f)," fills in this gap for trademarks and service marks, stating in relevant part:

> (a) For a trademark or service mark—

>> (1) Ownership of prior registration(s). In appropriate cases, ownership of one or more active prior registrations on the Principal Register or under the Trademark Act of 1905 of the same mark[1] may be accepted as prima facie evidence of

---

[1] A proposed mark is the "same mark" as a previously-registered mark for the purpose of Trademark Rule 2.41 if it is the "legal equivalent" of such mark. *In re Dial-A-Mattress Operating Corp.*, 57 USPQ2d at 1812. A mark is the legal equivalent of another if it creates

distinctiveness if the goods or services are sufficiently similar to the goods or services[2] in the application; however, further evidence may be required.

(2) Five years substantially exclusive and continuous use in commerce. In appropriate cases, if a trademark or service mark is said to have become distinctive of the applicant's goods or services by reason of *the applicant's substantially exclusive and continuous use of the mark in commerce* for the five years before the date on which the claim of distinctiveness is made, a showing by way of verified statements in the application may be accepted as prima facie evidence of distinctiveness; however, further evidence may be required.

(3) Other evidence. In appropriate cases, where the applicant claims that a mark has become distinctive in commerce of the applicant's goods or services, the applicant may, in support of registrability, submit with the application, or in response to a request for evidence or to a refusal to register, verified statements, depositions, or other appropriate evidence *showing duration, extent, and nature of the use in commerce and advertising expenditures in connection therewith (identifying types of media and attaching typical advertisements), and verified*

---

the same, continuing commercial impression such that the consumer would consider them both the same mark. *Id.*

[2] Section 1212.04(c) of the TMEP provides the following guidance to the examining attorneys in determining whether the goods or services identified in the involved application are "sufficiently similar" to the goods or services identified in the active prior registration under Trademark Rule 2.41(a)(1):

> If the similarity or relatedness is self-evident, the examining attorney may generally accept the §2(f) claim without additional evidence. This is most likely to occur with ordinary consumer goods or services where the nature and function or purpose of the goods or services is commonly known and readily apparent (e.g., a prior registration for hair shampoo and new application for hair conditioner).

> If the similarity or relatedness of the goods or services in the application and prior registration(s) is not self-evident, the examining attorney may not accept the §2(f) claim without evidence and an explanation demonstrating the purported similarity or relatedness between the goods or services. This is likely to occur with industrial goods or services where there may in fact be a high degree of similarity or relatedness, but it would not be obvious to someone who is not an expert in the field. (internal case citations omitted).

> *statements, letters or statements from the trade or public, or both,*
> *or other appropriate evidence of distinctiveness.*

(Emphasis added). As acknowledged by the majority, a claim of distinctiveness under Section 2(f) typically is not filed in a Section 1(b) application before the applicant files an amendment to allege use or a statement of use, because a claim of acquired distinctiveness, by definition, requires prior use. While the language set forth in Trademark Rule 2.41(a)(1) which makes no mention of use in commerce, and Federal Circuit precedent supports the principle that a "transfer" of acquired distinctiveness may occur from a previously registered mark to an intent-to-use application, I disagree that this tenet extends to either the second or third manner of demonstrating acquired distinctiveness as set forth in subsections (2) and (3) of Trademark Rule 2.41(a).[3] Nor do I think that the plain language of these subsections—which clearly contemplate prior use of the applied-for mark and make no mention of "the same mark" or "sufficiently similar goods or services"—are applicable to intent-to-use applications. The majority attempts to rectify this discrepancy by adding a new requirement to subsections (2) and (3) that the goods or services for which the same mark has acquired distinctiveness must be "sufficiently similar or related" to the goods or services identified in an intent-to-use

---

[3] Professor McCarthy goes one step further by taking the position that the practice set forth in TMEP § 1212.09(a) is invalid in its entirety because by definition, a mark based on a bona fide intent to use in commerce, as opposed to actual use in commerce, cannot acquire distinctiveness within the meaning of Section 2(f). "Such a route to registration is beyond the scope permitted by the statute. Lanham Act § 2(f) requires proof that the mark 'has become distinctive.' 'Has become distinctive' clearly denotes a status already established in the past. In my view, the statute requires that acquired distinctiveness (secondary meaning) be an accomplished fact, not a possibility that may occur if and when the designation is used as a mark in the future." 2 McCarthy § 15.65.

application. This new requirement, however, amounts to a re-drafting of Trademark

Rule 2.41.